[No. 28737.  *En Banc.*  April 5, 1943.]

BRITISH COLUMBIA BREWERIES (1918) LIMITED, *Appellant,* v. KING COUNTY *et al., Respondents.*[1]

[1]Reported in 135 P. (2d) 870.

438

*Lewis & Black,* for appellant.

*B. Gray Warner, Wm. R. Bell,* and *Edwin C. Ewing,* for respondent King county.

*The Attorney General, Fred E. Lewis,* and *Stanbery Foster, Assistants,* for respondent state of Washington.

BEALS, J.—British Columbia Breweries · (1918) Limited, a corporation, instituted this action against

King county, asking judgment for the amount of certain personal property taxes which it had paid under protest. After the institution of the action, the state of Washington was allowed to intervene, because of certain interests which will be later referred to.

Plaintiff was the owner of several large buildings located on land owned by defendant, King county, but which had been leased during the year 1917 for the term of thirty-five years, which lease, after having been supplemented by other agreements, was assigned to Hemrich Brewing Company. The last named company, having applied to the county for the purchase of the property covered by the lease, August 16, 1937, received from the county a deed purporting to convey fee simple title to the land. By the decision of this court in the case of *Commercial Waterway Dist. No. 1 v. King County*, 200 Wash. 538, 94 P. (2d) 491, decided September 26, 1939, the deed from the county was held void because the county held title to the land in its governmental capacity. After the delivery of the deed by the county, the property was assessed as privately owned real estate, unpaid taxes having been canceled after the decision of this court above referred to.

The plaintiff in this action became the owner of the lease from the county, and of the buildings which had been constructed thereon, through the foreclosure of a mortgage against Hemrich Brewing Company, that corporation having become insolvent. After the deed from the county was held void, personal property taxes against the buildings which had been erected on the land covered by the lease were levied in 1940, and included in the taxes to be collected during the following year. These taxes were levied not only for the year 1940, but for the years 1938 and 1939, as omitted taxes. Plaintiff paid the taxes under protest, and brought this action to recover a portion of the amount so paid, rely-

ing upon certain alleged irregularities in the course of the proceedings leading up to the spreading of the taxes upon the tax rolls, and also contending that the assessed valuation of the property was so grossly excessive as to entitle plaintiff to recover substantially one-half of the tax paid. By its answer, the county challenged the material allegations of plaintiff's complaint, and, by its pleading in intervention, the state presented certain questions concerning the legal authority of the tax commission of the state.

The action was tried to the court sitting without a jury, and resulted in a judgment dismissing plaintiff's action, from which plaintiff has appealed.

Error is assigned upon several of the findings of fact and conclusions of law entered by the trial court; upon the failure of the trial court to consider certain evidence in connection with the value of the property; upon the refusal of the trial court to grant appellant any relief; and upon the entry of the judgment of dismissal.

The original lease from the county contained, *inter alia,* the following provisions:

"Said property shall be used by the lessee for the purpose of erecting and operating thereon commercial, manufacturing and industrial plants and buildings, and its use shall be limited at all times during the term of this lease to a use for commercial, manufacturing and industrial purposes. . . .

"It is expressly understood and agreed that all buildings and improvements constructed or erected upon said leased premises by the lessee during the term of this lease shall be subject to taxation and that the taxes thereon shall at all times during the term of this lease be paid by the lessee."

During the years 1935 to 1937, inclusive, the buildings and improvements on the property which is the subject matter of this action were assessed at the

valuation of $22,400, and taxes were paid thereon at that valuation by the holder of the lease. For the years 1938 and 1939, the buildings were assessed at approximately thirty thousand dollars, but these taxes were, of course, not paid, and were later canceled.

During the month of May, 1940, the assessor of King county, acting on his own motion, pursuant to Rem. Rev. Stat., § 11142 [P. C. § 6882-59], assessed the property for the current year (as personalty), and for the two preceding years as omitted property, delivering to the county treasurer a copy of the assessment. For the year 1938, he placed an assessed value on the property in the sum of $22,400, for the year 1939 a valuation of $25,230, and the same valuation for the year 1940. Pursuant to these valuations, the taxes levied for the three years amounted to $3,939.83.

The county board of equalization convened on the first Monday of July, 1940, pursuant to Rem. Rev. Stat. (Sup.), § 11220 [P. C. § 6882-68], and in due time adjourned, having performed its functions, without having taken any specific action in regard to the property above referred to, and having approved the assessment rolls and certified the same.

July 30, 1940, the county assessor, upon his own initiative, made a second assessment for the current year and for the two preceding years as omitted property, in which he valued the buildings and improvements with which we are here concerned, for the years 1938 to 1940, inclusive, at twelve thousand dollars. On receiving this second omitted property and current year assessment, the treasurer of King county, doubting the authority of the county assessor to make such a second assessment after the tax rolls had been approved by the county board of equalization, and after the adjournment of that board, referred the matter to the state tax commission, requesting that he be

directed by that commission as to the procedure which he should follow. After consideration, the state tax commission advised the county treasurer that the valuations as fixed by the county assessor in his first assessment should stand. In thereafter preparing the tax rolls for delivery to the county treasurer, the county assessor, however, certified to the treasurer for collection a tax roll based upon the valuation of twelve thousand dollars for each of the years referred to, being the valuation contained in his second assessment.

The matter having been again referred to the state tax commission, a hearing was held, at which appellant was represented, and, after hearing testimony, the state tax commission directed the treasurer to correct the tax rolls as delivered to him by the assessor, by making the same show a tax based upon valuations as contained in the first listing and assessment by the assessor. The treasurer obeyed the order of the tax commission, and appellant paid under protest the taxes as computed upon the assessor's first valuation, and instituted this action.

Appellant's principal arguments are directed to two phases of the case:

"First: It was not within the power of the county treasurer to alter the certified tax rolls in his possession for collection, and the purported authorization by the tax commission to make the alteration was void.

"Second: Even if the alteration of the tax rolls by the county treasurer, pursuant to the order of the tax commission, was valid, the plaintiff is entitled, in any event, to a refund of the taxes which the plaintiff was compelled to pay under protest, based upon an arbitrary, illegal and grossly exorbitant assessed valuation."

Appellant's first contention is that the state tax commission lacked authority to conduct the hearing in which the action of the county assessor in

changing his first assessment was reviewed and ordered corrected. Appellant argues that the treasurer should have referred the matter to the county board of equalization, Rem. Rev. Stat., § 11268 [P. C. § 6282-107], providing that the treasurer shall report to that board any omissions from or errors in the tax rolls which come to his attention. In the case at bar, the act of the assessor in sending to the county treasurer his second assessed valuation did not constitute any error or mistake on his part, but rather an unwarranted attempt to alter the tax rolls as previously prepared by him. The situation was not one which the treasurer was required to refer to the county board of equalization.

In changing the valuation of the property, July 30, 1940, after he had formally acted upon the matter, and his action had been referred to the county treasurer, and the county board of equalization (which convenes the first Monday of July, and continues in session not more than two weeks, Rem. Rev. Stat. (Sup.), § 11220) had completed its July session, the assessor acted without warrant of law. In *Lewis v. Bishop,* 19 Wash. 312, 53 Pac. 165, this court, referring to a somewhat similar situation, said:

"Passing to the merits, the first question to be considered is the right of the assessor to alter or change the assessment after he has returned it and filed the lists and books with the clerk of the board. Laws 1897, p. 160, § 54 (Bal. Code, § 1710) requires him to file the same on or before the first Monday in August, and to verify it by his affidavit. We think that when this has been done it is beyond the power of the assessor to make any corrections therein or additions thereto. The statute nowhere authorizes him to interfere with the rolls after the same have been filed, and there are many reasons why he should not be permitted to do so."

The case cited is not controlling, but bears on the question.

The first assessment listing, dated May 22, 1940, and called to the attention of the county treasurer June 7th following, purported to assess the property for all the years as omitted property, and called upon the county treasurer to proceed immediately to collect the same by distraint. This procedure was erroneous, and was corrected without sale of the property. July 30, 1940, the treasurer received from the assessor the second listing. The county tax rolls had been referred to the county board of equalization when it convened pursuant to law the first Monday in July. The attempt of the assessor to change the valuation of the property as of the date July 30, 1940, was irregular.

By Rem. Rev. Stat. (Sup.), §§ 11091 [first] and 11091 [second] [P. C. §§ 6874-5 and 6874-5a], the state tax commission is vested with certain supervisory authority over county assessors, treasurers, boards of equalization, etc., in connection with their duties relating to taxation. By Rem. Rev. Stat. (Sup.), § 11102 [P. C. § 6874-12], it is made the duty of public officers to comply with lawful orders of the commission. The treasurer requested a ruling from the commission as to which assessment he should adopt, and the commission, after considering the matter, directed the treasurer to make the change in the rolls as delivered to him by the assessor above referred to.

Appellant argues that the tax commission lacked lawful authority to direct the treasurer to make any change in the tax rolls as the same were delivered to him by the assessor, and that, by its order, which the treasurer obeyed, the tax commission directed the treasurer to perform a function beyond the scope of his office. Under § 11102, *supra,* it was the duty of the treasurer to comply with the commission's order. Appellant relies upon the case of *Northern Pac. R. Co. v. Henneford,* 9 Wn. (2d) 18, 113 P. (2d) 545, in which

the rule-making power of the tax commission under the statute was considered, and upon the case of *State ex rel. State Tax Commission v. Redd,* 166 Wash. 132, 6 P. (2d) 619, in which the question of the power of the tax commission to assess intracounty property was considered. These cases are not in point here.

It is argued that, in directing the county treasurer to refuse to recognize the second assessment as made by the county assessor upon the supplemental roll, and to change the assessment roll, the tax commission exceeded its statutory authority, lacking any right, by its order, to direct the action of the treasurer.

The fourth paragraph of Rem. Rev. Stat. (Sup.), § 11091 [second], reads as follows:

"Fourth—To confer with, advise and direct Assessors, Boards of Equalization, County Boards of Commissioners, County Treasurers, County Auditors and all other county and township officers as to their duties under the law and statutes of the state, relating to taxation, and to direct what proceedings, actions or prosecutions shall be instituted to support the law relating to the penalties, liabilities and punishment of public officers, persons, and officers or agents of corporations for failure or neglect to comply with the provisions of the statutes governing the return, assessment and taxation of property, and the collection of taxes, and cause complaint to be made against any of such public officers in the proper county for their removal from office for official misconduct or neglect of duty. . . ."

Rem. Rev. Stat. (Sup.), § 11102, contains the following:

". . . whenever it shall appear to the Tax Commission that any public officer or employee whose duties relate to the assessment or equalization of assessments of property for taxation or to the levy or collection of taxes has failed to comply with the provisions of this act or with any other law relating to such duties or the rules of the commission made in pursuance

thereof, the commission after a hearing on the facts may issue its order directing such public officer or employee to comply with such provisions of law or of its rules, . . ."

In listing the property here in question for taxation as omitted property, the assessor acted pursuant to Rem. Rev. Stat., § 11142, which provides that any property shown to have been omitted from the assessment list of any preceding year shall be entered "in the detail and assessment list of the current year." Pursuant to this section, a "detail list of personal property" was prepared for the year 1938, and a similar list for 1939 and 1940. The lists bear date May 22, 1940, and were filed with the county treasurer June 7th following. On these lists the property was valued for purposes of taxation in the amounts above stated. July 30, 1940, the assessor prepared and filed with the county treasurer the second series of lists above referred to, upon which the assessed value of the property was greatly reduced. The first series of lists, being perfectly regular in every way, fully accomplished the duty of the assessor in the premises, and our attention has been called to no statutory or other authority authorizing the assessor to alter these lists merely by subsequently filing other lists changing the valuation of the property. After the filing of the first lists, the county board of equalization met, and it had adjourned prior to the filing of the second series of lists. If a county assessor could make one change in his formal assessment of property, simply by filing with the treasurer a list showing different valuations, he could in a similar manner make two or more further changes. In the absence of some statutory or other authority for making the change, the second lists were of no force or effect.

In holding the hearing above referred to, the tax commission was within its authority as vested

in it by the statutes above referred to. Unless these statutes are obnoxious to some constitutional provision, the action of the tax commission was valid.

In the case of *State ex rel. King County v. State Tax Commission,* 174 Wash. 668, 26 P. (2d) 80, this court, sitting *En Banc,* unanimously held that Rem. Rev. Stat., § 11092 (now Rem. Rev. Stat. (Sup.), § 11092 [P. C. § 6874-6]), authorizing the tax commission to entertain appeals from the county boards of equalization, was a valid exercise of the legislative authority. Other decisions of this court to the same effect are cited in the opinion.

The right to review on appeal the acts of a county board of equalization calls for the exercise of no lesser power than the authority to review, upon due notice and after hearing, the action of a county assessor. While the right to review the acts of a board of equalization on appeal is directly granted by the statute, the authority exercised by the tax commission, which is questioned in the case at bar, is clearly granted to the commission by the statutes above referred to. In so far as the question here presented is concerned, we hold that these statutes are not obnoxious to objection on constitutional grounds.

In the case of *Woodburn v. Skagit County,* 120 Wash. 58, 206 Pac. 834, this court directed the correction of the county tax rolls then in possession of the county treasurer, to eliminate an overvaluation of certain lands by the assessor, it appearing that the rolls contained a manifest clerical error.

In the recent case of *Olympic Motors, Inc., v. McCroskey,* 15 Wn. (2d) 665, 132 P. (2d) 355, we considered a rule promulgated by the state tax commission pursuant to statutory authority, and held valid the acts of the commission.

In the case at bar, when the treasurer received the county personal property tax roll for the year 1941,

which had been prepared by the assessor, the treasurer's attention was at once called to the fact that this roll showed a different valuation of the property here in question from that shown on the omitted property roll which had been prepared by the assessor and delivered to the treasurer June 7, 1940. The treasurer then was confronted with the dilemma of choosing between two rolls, admittedly contradictory, and only one of which could be valid.

By Rem. Rev. Stat. (Sup.), § 11244 [P. C. § 6882-83], it is provided that "the county treasurer shall be the receiver and collector of all taxes extended upon the tax rolls."

In the performance of his duty, the treasurer must determine from the tax rolls as delivered to him exactly the taxes which should be collected. In performing this duty, he acts in a ministerial capacity, but nevertheless he must determine from the tax rolls which he has received from the proper county officers the facts which form the basis upon which he must act in collecting the taxes. In making this determination, he is acting merely in a ministerial capacity. 43 Am. Jur. 75, § 258; 46 C. J. 1036, § 303; Mechem on Public Officers, 442, § 658.

Confronted with this dilemma, the county treasurer sought the advice of the state tax commission, which held a hearing at which all parties were represented, with the result that the tax commission ruled that the assessment made by the assessor under date May 22, 1940, was the valid assessment of the property in question, and that the later assessment roll showing a different valuation should be by the treasurer corrected so as to make it conform to the valid assessment. A choice had to be made between the two inconsistent assessments. The question of which of the two embodied the valid act of the assessor was controlled by

law, and not by the discretion of the treasurer or the tax commission.

In acting as it did, the tax commission undertook merely to determine the facts upon which the treasurer should lawfully act in his ministerial capacity. The commission refrained from expressing any opinion upon the matter of valuation.

The tax commission had lawful authority to hear the question presented, and to direct the treasurer as to the manner in which he should proceed. As a matter of law, the tax commission ruled correctly upon the question which was presented, and, in complying with the commission's direction, the treasurer acted in accordance with law.

We shall now consider appellant's second contention. The court made extensive findings of fact, but made no finding as to the value of the property nor any finding or conclusion concerning appellant's contention that the valuation of the property upon which it paid the taxes in question was so grossly excessive as to require the court to reduce the taxes pursuant to the rule laid down in the decisions of this court. The evidence, of course, is before us, and the case, being here *de novo*, should not be sent back for an appropriate finding by the trial court, if upon the record before us it appears that appellant's contention now under discussion is not well founded.

As above stated, appellant's predecessor in ownership of the lease for three years next prior to 1938 paid taxes upon the property based upon a valuation in an amount only a little less than the valuation upon which appellant paid the taxes for the following years, under protest. This fact, as we said in the recent case of *Northwestern & Pac. Hypotheekbank v. Adams County*, 174 Wash. 447, 24 P. (2d) 1086, while not of controlling importance, is an element to be con-

sidered in connection with the other facts disclosed by the record. In the case at bar, the evidence is of less importance than it was in the case cited, but should nevertheless be considered.

In the early case of *Andrews v. King County*, 1 Wash. 46, 23 Pac. 409, 22 Am. St. 136, this court, in reversing an order of the superior court dismissing an action brought to challenge the valuations for taxation purposes, placed upon certain property by the county officers, said:

"We think the uniform ruling of the higher courts has been that, while equity will not interfere to correct mere mistakes or inadvertencies, or to contravene or set aside the judgments of assessors or boards of equalization in relation to values, it will interfere when the officers fraudulently, capriciously or tyrannically refuse to exercise their judgment by adopting a rule or system of valuation designed to operate unequally, and to violate a fundamental principle of the constitution."

The rule laid down in the case cited has been consistently followed in many cases. In *Templeton v. Pierce County*, 25 Wash. 377, 65 Pac. 553, the court said:

"Fraud on the part of the assessing officer may be presumed from a palpably excessive or exorbitant overvaluation. The court will grant relief for an arbitrary, fraudulent, or malicious excessive valuation by the assessing officer. Where the assessing officer has exercised an honest judgment, and no fraud or arbitrary or capricious action in making the assessment is shown or can be presumed, the court will not interfere."

In the case of *Dexter Horton Bldg. Co. v. King County*, 10 Wn. (2d) 186, 116 P. (2d) 507, this court reversed a judgment of the superior court reducing the assessed valuation of the plaintiff's real estate, and directed that taxes be paid upon the valuation returned by the assessor. The action was based upon an alleged overvaluation of the property. The rule was again

stated that equity would interfere when the taxing officials fraudulently, capriciously, or tyrannically refuse to exercise their judgment, and adopt a system of valuation designed to operate unequally in violation of a constitutional principle, but that a mere overvaluation of property by taxing officials, if made in good faith and in the exercise of an honest judgment, constitutes no ground for equitable relief, and that

" . . . equity will not interfere to correct mere mistakes or inadvertences, or to set aside the judgments of taxing officials in relation to values."

In the recent case of *American Smelting & Refining Co. v. Whatcom County,* 13 Wn. (2d) 295, 124 P. (2d) 963, we quoted with approval from the case of *Baker Inv. Co. v. Pierce County,* 175 Wash. 669, 27 P. (2d) 1092, the following:

" 'It is not enough that we should be of the opinion that the assessments were in excess of the true values of the property. The question of value is largely one of opinion, and in such cases the law has confided to the taxing officers the authority to determine values. It is only when the officers act maliciously, capriciously or fraudulently, that their conclusions as to values will be disturbed.

" 'The courts will not interfere because of a mere difference of opinion as to values.' "

In the case at bar, while the property supposedly rested in private ownership, pursuant to the deed from the county above referred to, the land and buildings were assessed as real estate. When the deed from the county was held void, as above stated, these assessments were canceled.

The property upon which the taxes with which we are concerned were levied consists of a group of seven buildings and a railroad spur, located at 5225 east Marginal way, Seattle, which the Hemrich Brewing Company formerly used in connection with its brewery

operations. The building of greatest value was the brewery itself, and the difference between the detail sheets made by the assessor resulted from a reduction in the valuation of this building. After having been used for some time as a soap factory, the building was remodeled for use as a brewery by the Hemrichs. Appellant introduced considerable testimony to the effect that the building was poorly constructed, and was ill-suited for most uses. The chief land and improvement deputy of the assessor's office testified that in his opinion the full valuation of the property, as of January 1, 1938, did not exceed twelve thousand dollars. Mr. Charles F. Clise, who represented appellant, and who stated that he had been familiar with the property for six or seven years, testified that in his opinion the buildings were not worth in excess of ten thousand dollars.

Mr. M. J. Lauridsen, Sr., testifying as a witness for appellant, stated that he was associated with Charles F. Clise, Agent, Inc., as vice-president and general manager, and that the corporation represented appellant in connection with its Seattle properties. The witness testified at length concerning his negotiations with the offices of the county assessor and the county treasurer. He also stated that, for eight months of the year 1940, the income from the property amounted to $820, while for 1941 the company's rental ledger showed an income from the property amounting to $1,980. Later, Mr. Lauridsen testified, in reply to a question on cross-examination, as follows:

"Q. Can you give us the total of the insurance carried on the several buildings out there? A. I can. I called our office and ascertained from the office that we have a policy dated March 1st, 1940, expiring March 1st, 1943, three years total coverage $75,900.00, premium $904.73, covering the buildings and contents and paid in full.

"Mr. Black: What were the contents on March 1st, 1940? A. The contents: At that time the equipment, machinery and brew tanks were still in the building. That had not been taken out."

■ Under ordinary circumstances, the amount for which property is insured is inadmissible upon the question of the value of the property. Of course, for one reason or another, property is often insured for an amount considerably less than its value, and the general rule above referred to is salutary. In other situations, property may be properly insured for more than its market value. In such a case as this, however, the amount of insurance carried by appellant is an element to be considered, particularly in view of the testimony introduced by appellant as to the small value of the property.

In the recent case of *Whiting v. Rubinstein,* 10 Wn. (2d) 5, 116 P. (2d) 305, in discussing the question of the value of a fishing schooner, this court called attention to the fact that the record showed that the vessel while under repair was insured for seven thousand dollars, and, when reconditioned, was insured for ten thousand dollars. In connection with this phase of the case, we said: "It may be that insurance values are higher than market values, but it was an item to be considered."

In 31 C. J. S. 885, § 182, is found the following:

*"Insurance.* The amount of insurance placed on a building furnishes no direct evidence of its value, but where it might indicate an estimate of the value of the property by the witness inconsistent with that testified to by him, the amount of insurance may be shown for impeachment purposes."

Under the circumstances of this case, the amount of insurance carried by appellant upon the property in question constitutes, as it did in the *Whiting* case, "an item to be considered."

The testimony above quoted being all the testimony concerning the matter of the insurance placed by appellant upon the property in question, leaves the record in a very unsatisfactory situation. Appellant argues that the testimony is without significance, as from the record it is impossible to tell the amount of insurance on the buildings and the amount which covered the "equipment, machinery and brew tanks." The question is scarcely so simple as that. The amount for which the property covered by the policy was insured is large. Appellant applied for and received the policy, and retained the same in its possession. The policy may have indicated the allocation of the insurance as between the building and contents, but appellant did not produce the policy. Appellant is the plaintiff in the action, and the burden rests upon appellant to prove its case. Appellant did not ask any questions concerning the matter, save as above quoted.

It is a well-established rule that

"The failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would thereby be elucidated, serves to indicate, as the most natural inference, that the party fears to do so, and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party. These inferences, to be sure, cannot fairly be made except upon certain conditions; and they are also open always to explanation by circumstances which make some other hypothesis a more natural one than the party's fear of exposure. But the propriety of such an inference in general is not doubted." II Wigmore on Evidence (3d ed.), p. 162, § 285.

The rule is again stated in 20 Am. Jur. 188, § 183:

"It is a well-established rule that where relevant evidence which would properly be part of a case is within the control of the party whose interest it would natur-

ally be to produce it, and he fails to do so, without satisfactory explanation, the jury may draw an inference that such evidence would be unfavorable to him. This rule is uniformly applied by the courts and is an integral part of our jurisprudence."

On p. 192, § 187, is found the following:

"The only inference that may be drawn from failure to produce available witnesses or evidence is that the testimony or the evidence would not have been favorable to the party omitting to produce such witnesses or evidence."

The rule was applied in the early English case of *Armory v. Delamirie,* 1 Strange 506, 93 Eng. Rep. 664. In this case, commonly referred to as the "chimney sweep's jewel case," it was held that the plaintiff might maintain trover against a jeweler to whom the plaintiff had delivered a jewel which he had found. The jury was instructed

" . . . that unless the defendant did produce the jewel, and shew it not to be of the finest water, they should presume the strongest against him, and make the value of the best jewels the measure of their damages: which they accordingly did."

The rule is that the only inference which may be drawn by the trier of the fact is that

" . . . the testimony if given would not have been favorable to the party who did not produce the evidence. Evidence of such conduct is persuasive rather than probative and cannot be invoked as substantive proof of any facts essential to the case of the opponent. The rule has been stated that the presumption will not supply a missing link in an adversary's case and cannot be treated as independent evidence of a fact otherwise unproved. It has been stated that the presumption arising from the nonproduction of evidence does not relieve the other party from the burden of proving his case." 20 Am. Jur. 195, § 193.

Under the circumstances here present, the testimony given is entitled to consideration. While respondent might have pursued the matter on cross-examination, it was not required to do so, the burden of proof in the action not resting upon respondent. Upon the record, the trier of the fact is justified in inferring that appellant had insured its buildings against loss by fire in a sum considerably in excess of what it now contends the buildings were worth. The matter is not conclusive, but bears against appellant's contentions.

Appellant relies upon several decisions of this court in which assessed valuations of property were reduced by the courts. These decisions support to some extent appellant's arguments, but are not controlling, as of course each of this class of cases must be decided upon its own facts.

Under our decisions above referred to, the burden rests heavily upon appellant to prove its case. We hold that appellant did not meet this burden. While the record is in several respects unsatisfactory, the trial court correctly construed the law governing the procedural questions involved, and the evidence as to the value of the buildings does not show such an overvaluation by the county assessor as to require reversal of the judgment appealed from, which is accordingly affirmed.

SIMPSON, C. J., BLAKE, ROBINSON, JEFFERS, and MALLERY, JJ., concur.

MILLARD, J. (concurring in the result)—I concur in the result. The treasurer could not do other than accept the first assessment; the second assessment was illegal—void. There was no occasion nor was there authority for functioning of state tax commission. *Lewis v. Bishop*, 19 Wash. 312, 53 Pac. 165; *State ex*

*rel. Yakima Etc. Co. v. Yakima County,* 192 Wash. 179, 73 P. (2d) 759.

Steinert, J. (dissenting)—Regardless of whether or not the county treasurer or the county assessor was bound by the first assessment to the exclusion of the second, I am of the opinion that, in any event, the amount of the assessment is grossly and palpably excessive and that appellant is consequently entitled to a refund of the taxes paid under protest. I therefore dissent.

Grady, J., concurs with Steinert, J.

[1]Reported in 135 P. (2d) 834.